ADP–FINANCIAL COMPUTER SERV-ICES, INC., Plaintiff-Appellee,

v.

The FIRST NATIONAL BANK OF COBB COUNTY, et al., Defendants-Appellants.

No. 82–8120.

United States Court of Appeals, Eleventh Circuit.

April 25, 1983.

Rehearing and Rehearing En Banc Denied June 3, 1983.

Trotter, Bondurant, Miller & Hishon, H. Lamar Mixson, Emmet J. Bondurant, James C. Morton, Atlanta, Ga., for defendants-appellants.

Rogers & Hardin, Hunter R. Hughes, C.B. Rogers and Richard H. Sinkfield, Atlanta, Ga., for plaintiff-appellee.

Before FAY and VANCE, Circuit Judges, and ALLGOOD *, District Judge.

FAY, Circuit Judge:

This is an appeal from a jury verdict in favor of the plaintiff, ADP–Financial Computer Services, Inc., (ADP), in a breach of contract action against the First National Bank of Cobb County for failure to pay agreed-to minimum monthly charges for on-line computer services provided by ADP for a 23 month period. We reject the Bank's argument that these charges constitute an impermissible penalty under Georgia contract law and affirm the jury's verdict.

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Background

This is a diversity case under Georgia contract law.

In August 1979, ADP, a New Jersey based firm in the business of providing computer data processing services to financial institutions, acquired Data Computation of Georgia, Inc. ("Data Comp"). Data Comp was owned by five shareholder banks in Atlanta, including the First National Bank of Cobb County, which held forty percent of the Data Comp stock. Data Comp served the five shareholder banks by processing deposit, loan and other financial data for those banks and approximately ten others from their data processing center in Atlanta. When ADP acquired Data Comp it agreed to continue to provide computer data processing to these fifteen customer banks and to replace the outdated hardware and software with ADP's modern national computer service product. More specifically, ADP and First National agreed to a three-year data processing services contract running from April 1, 1979 to March 31, 1982. This contract obligated ADP to perform certain data processing services as requested by First National. These services fell into five categories. The Bank was obligated to pay for these services as they were ordered; i.e., the charges were "transaction related." The services were to be provided to First National for the charges listed in a schedule which was part of the contract. Also included in the contract was the provision that regardless of First National's actual use of the data processing services, they would pay ADP a minimum monthly charge equal to eighty percent of the average monthly charge for the services during the immediately preceding six-month period. If First National used the services, they paid for them by the transaction. But if use in any month fell below the average use for the preceding six months, they still were to pay eighty percent of this average as a minimum monthly charge. This formula for minimum monthly charges was to be applied and figured separately for each of the five services categories.

ADP was progressing toward conversion to their national system when, in October 1979, Mr. Jack Gray and Mr. Bud Shaw bought controlling interest in First National. Mr. Gray became president and chief operating officer of First National and, shortly, directed his data processing committee to re-evaluate the bank's relationship with ADP. This committee asked at least six other vendors of computer equipment and services to bid for First National's business in spite of the existing and on-going contract with ADP. During this search, Mr. Gray found out that one of the computer firms, Trusco Data Services, had ordered a computer from IBM appropriate for bank in-house data processing, and that Trusco would assign their right to purchase the computer to Mr. Gray if Trusco were awarded ADP's data processing work. At the same time, Mr. Gray received advice from his accounting firm that substantial financial benefits would accrue to him personally if he were to purchase the computer and related equipment and then lease the equipment to First National.

On February 12, 1980, at Mr. Gray's request, Mr. Gray and other bank officers met with ADP's president, Mr. McInerney, and two other ADP officers. At this meeting, Mr. Gray voiced his interest in taking First National's computer operations "in-house."[1] Three days later, First National concluded its negotiations with Trusco and agreed to change from ADP's computer service to Trusco's. For the next three months, First National continued to use and pay for services in all five categories. In May they stopped using services in three categories but continued using the other two. First National paid for services in the two categories which they used but did not pay the

---

1. First National contends that Mr. Gray and Mr. McInerney agreed to terminate their contract at this February 12th meeting and that a later series of letters confirms this contention. However, it is clear from the record in general and the jury instructions in particular, that the jury specifically found this not to be the case. There is ample evidence to support this finding and we do not disturb it.

minimum service charge as formulated for the other three categories.

The jury awarded ADP compensatory damages in the amount of $411,360.32—the total of the minimum monthly charges for the remaining months of the contract. The jury also concluded that First National had acted in bad faith or had been stubbornly litigious, so that ADP was entitled to further awards of interest and litigation expenses.

First National raises four issues on appeal. First, they contend that the trial court erred in denying First National's motion for judgment notwithstanding the verdict or, alternatively, in denying First National's motion for a new trial on the issue of damages. Second, First National argues that ADP's cashing of checks paid for services actually rendered, which were less than ADP's invoices for minimum monthly charges, constituted an accord and satisfaction barring further recovery. Third, First National contends that ADP's customer surveys should have been admitted either for impeachment or as a business record. Fourth, First National argues that the trial court erred in denying their motion for directed verdict and J.N.O.V. on the issue of attorney's fees and litigation costs.

Damages

■ Both ADP and First National spent most of their efforts in briefing this appeal arguing whether the questioned clause was permissible as a liquidated damage provision or constituted an impermissible penalty. At oral argument and in a supplemental brief, ADP abandons this position and supports a different interpretation. We think this change of course is a wise one.[2] Georgia law does not interpret contracts as providing for liquidated damages unless it is clear that the parties intended it. *Jones v. Clark,* 147 Ga.App. 657, 249 S.E.2d 619 (1978); Ga.Code Ann. Section 13-6-7. While the words "liquidated damages" are

not specifically required, some manifestation of the parties intent to agree to liquidated damages is. In meeting what they presumed would be ADP's position on appeal—i.e., that the provision was an enforceable liquidated damages clause—First National said in their brief, "The 'minimum monthly charge' clause on which ADP relied in this case does not meet this threshold condition, [intent], of enforceability of a liquidated damage clause under Georgia law." Appellant's brief at p. 24. Unfortunately for the writer, we wholeheartedly agree. If there was some evidence to suggest that the parties intended this clause to be a liquidated damage provision, we feel that it would certainly fail the strict tests of Georgia law concerning that kind of contract.

■ The "minimum monthly charge" provision was found in the contract under a heading called "Cost of Services."

No mention is made of "liquidated damages," "breach," or other condition to suggest that this provision sought to establish liquidated damages, and we think it clear that this was not the parties' intent.

If not liquidated damages, then what? As a reading of the contract suggests and ADP now contends, the disputed provision simply describes the price to be paid for ADP's services. Taking again from First National's brief:

> "As long as the Bank's usage of ADP's service charges exceeded eighty percent of the average of the charges paid by the Bank for the immediately preceding six months, the 'minimum monthly charge' provision in the ADP contract did not apply. The 'minimum monthly payment' clause applied only if, as the Bank performed the contract, the volume of transactions processed by ADP for the Bank in a particular month fell below the average cost during the immediately preceding six

---

**2.** We do not endorse or encourage this sort of mid-stream horse switching. But our efforts to dispose of issues on appeal will not be deterred simply because the correct answer was not suggested until oral argument. Both sides were allowed to discuss the issues fully before,

during and after oral argument. First National, as appellant, controls their choice of issues on appeal. That their appeal was met with more than one response does not prejudice them in this case.

months. Only then was the Bank required to pay ADP the 'minimum monthly charge' for that particular month." Appellant's brief at p. 25.

The purpose of the eighty percent provision was to provide ADP an even flow of payments during performance, without abrupt decreases in a month in which the volume of a customer's transactions fell below the average for the immediately preceding six months. Appellant's brief p. 25 n. 17. This was important because ADP's primary investment had been made when they bought the equipment, and a steady flow of cash was part of their bargain to enable them to switch to their new national computer service system.

■ When First National stopped using ADP's services in three categories, the eighty percent minimum monthly charge provision was triggered. The charges for the other two categories continued to be billed on a per-transaction basis. Mr. Gray's outside deal to buy a computer and take his bank's processing "in-house" did not breach or terminate First National's contract with ADP. In fact, his actions did not affect the contract at all other than to trigger the eighty percent provision. No clear repudiation existed to constitute anticipatory breach because First National continued to use ADP for service in two of the five categories.[3] *Phosphate Mining Co. v. Atlanta Oil & Fertilizer,* 20 Ga.App. 660, 93 S.E. 532 (1917). Where no repudiation occurs, the contract is not breached simply by First National's not requesting service in the three categories. Nothing in the contract obligated them to request services and ADP was obligated to provide service only as requested. The record shows that First National could have asked for and received ADP's service in all five categories after they converted to Trusco as ADP continued to provide these services to other customer banks.

■ Therefore, First National's argument that ADP must prove actual damages is incorrect. This suit was to collect the contract price and that is what the jury awarded. In the absence of some termination, ADP is allowed to recover the price agreed for their services. 5 Corbin, Contracts Section 1110 (1964). First National's reliance on *Bennett v. Associated Foods, Inc.,* 118 Ga.App. 711, 165 S.E.2d 581 (1968), and *Bennett v. Smith,* 245 Ga. 725, 267 S.E.2d 19 (1980) for the idea that ADP must mitigate their loss after repudiation is misdirected. As the jury found, the contract had not been terminated.

We think the situation is somewhat like a telephone customer service contract. If the customer does not use his phone and communicates to his friends by other means, he still must pay his minimum monthly bill, even if the telephone company knows he is not making calls. Something must terminate the telephone service contract to relieve the customer's obligation to pay his bill. If he does not pay his bill, the company can sue and recover it in court. The company is not required to prove actual damages—only that there was a contract for service at a certain rate and that the bill was not paid.

The jury's verdict was supported by the record and the trial court properly denied First National's motions for judgment notwithstanding the verdict and for a new trial.

Accord and Satisfaction

■ First National argues that when ADP cashed the checks from the bank for services actually rendered, that an accord and satisfaction occurred which bars further recovery. Under Georgia law, an accord and satisfaction is a contract which, like other contracts, requires a "meeting of the minds." *Myers v. American Finance System of Decatur, Inc.,* 615 F.2d 368 (5th Cir.1980); Code Ga. Section 20–1201. If a check is tendered for less than the amount

---

**3.** There is some argument over whether ADP was able to provide service in the three discontinued areas after some months of First National's conversion to Trusco. The evidence supports ADP's contention that they were, and it was First National who stopped requesting service.

in dispute, both parties must intend that acceptance will be an accord and satisfaction. *Dixie Belle Mills v. Specialty Machine Co.,* 217 Ga. 104, 120 S.E.2d 771 (1961); *American Food Purveyors, Inc. v. Lindsay Meats, Inc.,* 153 Ga.App. 383, 265 S.E.2d 325 (1980). The amounts for which the checks were made were not in dispute. There was evidence that the paying officer from First National had conversations with local officers of ADP agreeing to pay the undisputed amounts pending resolution by the two firms' top management of disputes over the remaining amounts. This evidence presented a jury question on accord and satisfaction. *Clark Equipment Credit Co. v. Refrigerated Transport Co.,* 148 Ga.App. 405, 251 S.E.2d 321 (1978); *Prater v. American Protection Insurance Co.,* 145 Ga.App. 853, 244 S.E.2d 925 (1978). In light of the evidence, it was permissible for the jury to find that no meeting of the minds—and therefore no accord and satisfaction—occurred by payment of these checks.

### Customer Surveys

First National argues that the trial court erred in not allowing them to introduce ADP's customer surveys as impeachment evidence or as an exception to the hearsay rule. The trial judge has broad discretion in the matter of admission or exclusion of evidence and will not be overturned absent an abuse of this discretion. *Salem v. U.S. Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Perkins v. Edwards,* 228 Ga. 470, 186 S.E.2d 109 (1971); *Camelot Condominium Ass'n., Inc. v. Metro Lawns, Inc.,* 161 Ga.App. 574, 288 S.E.2d 325 (1982).

■ First National sought to use the surveys to impeach testimony that ADP's services had improved since the firm had been bought from Data Comp. While the surveys did contain some criticism of ADP's service, the trial judge did not abuse his discretion in disallowing the evidence for impeachment purposes. There was nothing in these surveys comparing service under ADP and service under Data Comp.

■ Likewise, the surveys do not qualify as a business records exception to the hearsay rule. Rule 803(6), Fed.R.Evid.

■ The surveys also do not qualify as an admission against interest under Rule 801(d)(2) Fed.R.Evid. because they are not statements made by a party-opponent. The trial judge did not abuse his discretion in disallowing ADP's customer survey as an admission or a business record.

### Attorney's Fees and Costs

First National also contends that the trial court erred in denying the bank's motions for directed verdict and judgment notwithstanding the verdict on the issue of attorney's fees and costs of litigation.

Ga.Code Section 13–6–11 provides:

The expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

The trial court submitted the issue of attorney's fees and expenses of litigation to the jury by a special interrogatory that asked, "Has the defendant been stubbornly litigious or acted in bad faith?" The jury responded, "Yes", and the trial court awarded attorney's fees, expenses and prejudgment interest to ADP.

■ First National argues that the "or" creates a disjunctive form of special interrogatory—bad faith *or* stubbornly litigious—which may only be affirmed if the award can be justified on *both* grounds. To support this idea they cite two cases. *Dougherty v. Continental Oil Co.,* 579 F.2d 954 (5th Cir.1978); *Prudential Insurance Co. of America v. Morrow,* 339 F.2d 411 (5th Cir.1964). It is true that these cases reverse general verdicts rendered under a disjunctive special interrogatory. But the problem in those cases is that one of the jury's choices was in some way flawed and not a proper basis for the jury's verdict. In this case the statute is clear that either bad faith or stubborn litigiousness can support the award of fees and costs. Georgia cases

are unanimous in holding that it is only necessary for the plaintiff to show that one of the conditions existed to recover fees and costs. *National Service Industries, Inc. v. Hartford Accident and Indemnity Co.,* 661 F.2d 458 (5th Cir.1981); *Blank v. Preventive Health Programs, Inc.,* 504 F.Supp. 416 (S.D.Ga.1980); *Gordon v. Ogden,* 154 Ga. App. 641, 269 S.E.2d 499 (1980); *Marler v. River Creek Assocs.,* 138 Ga.App. 471, 226 S.E.2d 311 (1976). The instructions were not in error.

The first possible ground for award of fees and costs is "bad faith." This has been defined as "actual or constructive fraud or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake, but prompted by some sinister motive." *Schaffer v. Wolbe,* 113 Ga.App. 448, 148 S.E.2d 437 (1966). If some evidence of bad faith is produced, the recovery of fees and costs under Section 13–6–11 may be submitted to the jury. *A.W. Easter Construction Co. v. White,* 137 Ga.App. 465, 224 S.E.2d 112 (1976). In this case there was evidence that First National stopped cooperating with ADP's conversion to the new system after Mr. Gray took charge, sought and accepted bids from other computer firms while under contract with ADP, and wrote letters which the jury found not to be sincere representations of prior events. Further, Mr. Gray entered into a highly lucrative equipment purchase and leasing arrangement between Trusco, himself and First National.

From this evidence the jury was authorized to conclude that First National had acted in bad faith. Because this finding is supported, it is unnecessary to demonstrate whether a finding of "stubborn litigiousness" is also authorized.

The decision is AFFIRMED.