# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1855

_____

|  |  |  |
|---|---|---|
| ACTONet, Ltd., | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Allou Health & Beauty Care, doing | * | District of Nebraska |
| business as The Fragrance Counter, | * | |
| Inc., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 13, 1999

Filed: August 1, 2000

_____

Before WOLLMAN, Chief Judge, McMILLIAN, Circuit Judge, and BATTEY,[1]
    District Judge.

_____

McMILLIAN, Circuit Judge.

Allou Health & Beauty Care, Inc. d/b/a The Fragrance Counter (Allou Health)
appeals from a final judgment entered in the United States District Court for the District
of Nebraska upon a jury verdict awarding ACTONet Ltd. (ACTONet)  $193,831.01

_____

[1]The Honorable Richard H. Battey, United States District Judge for the District
of South Dakota, sitting by designation.

for contract damages. See ACTONet, Ltd. v. Allou Health & Beauty Care, Inc., d/b/a The Fragrance Counter, No. 4-98CV3008 (D. Neb. Mar. 3, 1999) For reversal, Allou Health argues that: (1) the district court erred in holding that parol evidence was admissible to explain the contract at issue, (2) evidence admitted was hearsay and should have been excluded, (3) the award of damages was excessive, not foreseeable and constituted a penalty, and (4) an exhibit not listed in the pre-trial order was improperly admitted into evidence. For the reasons discussed below, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

Jurisdiction was proper in the district court based on 28 U.S.C. § 1332 (diversity jurisdiction). Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notices of appeal were timely filed pursuant to Fed. R. App. P. 4(a).

BACKGROUND

ACTONet, headquartered in Lincoln, Nebraska, is a developer of websites where customers can purchase products over the Internet. In September 1996, Eli Katz, vice president of Allou Health, commenced discussions with Ronald Brown, president of ACTONet, regarding the development of a website for the sale of men's and women's fragrances, which site was named The Fragrance Counter. At the time discussions commenced between ACTONet and Allou Health, Allou Health had a website on America On-Line for which it was paying twelve percent of revenue.

ACTONet's Brown sent a letter, dated October 16, 1996, to Allou Health's Katz, setting forth proposed elements of an agreement under which ACTONet would develop a website and provide Internet services for The Fragrance Counter. See Trial Exhibit 1. In this letter Brown stated that ACTONet's proposal "will be based on a partnership. [ACTONet] will provide the server space, T-1 access, and the Web site for The Fragrance Counter. [Allou Health] will have no initial site development

-2-

expenses but will be charged twelve percent of [its] gross sales."  Brown also stated in this letter that he "would like to enter into a three year contract if possible," and that "[Allou Health]  must be happy with the site and its functionality for the contract to be valid."   Following the receipt of this letter, Katz e-mailed Brown requesting a written contract.    Brown   responded  by  sending  ACTONet's  preprinted  Internet  sales agreement to Allou Health.  The agreement, which was in triplicate with white, yellow and pink copies, was unsigned by ACTONet.[2]  Under the heading "description," the proposed agreement incorporated the above quoted language of the October 16, 1996, letter, except for did the language stating that Allou Health "must be happy with the site and its functionality for the contract to be valid." Trial Exhibits 2A and 2B. The "description" stated in relevant part that:

> To sum it up, your [Allou Health] staff will keep the site current by uploading changes in text and images, and we [ACTONet ] will supply the engine, templates, the shopping cart, the secure server, Internet access, and advice on using the system.  This arrangement will cost your company 12% of gross sales generated by Compuserve and Prodigy which will cost The Fragrance Counter 4% of gross sales.  ACTONet would prefer to enter into a three year contract if possible.  Trial Exhibits 2A and 2B.

Below the "description," the form agreement stated that, "[t]he following terms and conditions supersede and take precedence over the above description."  Paragraph 16 of these terms provided:

---

[2]Prior to commencement of the trial, the yellow copy was designated at Exhibit 2, but during the course of the trial the district court admitted the white copy, and designated the yellow copy as Exhibit 2A and the white copy as Exhibit 2B.  See discussion below regarding the admission of Exhibit 2B.

The client shall pay ACTONet for its direct costs of production, art, artwork, mailing, packaging, shipping, taxes and duties, Federal Express charges, facsimile charges, and telephone calls incurred by ACTONet in connection with the performance of this agreement. The client shall pay all of ACTONet's costs for any necessary traveling done on behalf of the client. Trial Exhibits 2A and 2B.

Paragraph 19 of the contract provided:

In the event that the client, after having approved any planned Internet services cancels all or any part thereof, the client shall pay for all costs incurred therefrom to the date of cancellation and any unavoidable costs incurred thereafter, including any noncancellable commitments, and ACTONet shall receive its gross profits, net profit, or loss of profits, as the case may be, on all such costs incurred. Trial Exhibits 2A and 2B.

Paragraph 25 of the contract provided that, "[t]he agreement may be terminated by either party on at least sixty (60) days prior written notice to the other party." Paragraph 26 stated, "[t]his agreement contains the entire understanding between the parties, cannot be changed or terminated orally and shall be construed in accordance with the laws of the State of Nebraska ... ." Trial Exhibits 2A and 2B.

Allou Health's Senior Vice President and Chief Financial Officer, David Shamilzedeh, reviewed the agreement, deleted paragraph 16 in its entirety by drawing a line through it, and wrote "see front" next to this deletion. He also inserted by asterisk the words "gross sales less returns and allowances" so that the second sentence of the "description" stated that," The Fragrance Counter will have no initial site development expenses but will be charged twelve percent of their gross sales less returns and allowances." Shamilzedeh signed the agreement on November 27, 1996, and returned it to ACTONet's Brown, who signed it as modified by Shamilzedeh, on December 2, 1996.

-4-

ACTONet's construction of The Fragrance Counter website began in the early summer of 1997, and the website became operational on August 7, 1997. Allou Health maintains that it was dissatisfied with the services provided by ACTONet because the site evidenced a lack of creativity, the design work took longer than expected, and the website did not function at times. Allou Health further maintains that, in September 1997, ACTONet switched servers during business hours without notifying Allou Health and that as a result of this switch, which took place during a public relations media blitz for the website, the site went down with no back-up. To the contrary, ACTONet contends that, after the website went online, it generated sales and received a good review in Web Magazine, an Internet public information source that reviews websites. See Trial Exhibit 15.

Sometime after the website became operational, but prior to September 19, 1997, Allou Health retained Organic Online, also known as Organic.com (Organic), to promote the website for The Fragrance Counter. In view of previously unanticipated advertising expenses incurred as a result of Organic's promotion of the website, Allou Health sought to renegotiate its agreement with ACTONet. As a result of retaining Organic, Allou Health's Katz called ACTONet's Brown and attempted to renegotiate their agreement. In a letter written by ACTONet's general counsel to Allou Health, dated September 19, 1997, ACTONet stated that, in response to Allou Health's informing ACTONet that it wished to renegotiate the parties' contract, ACTONet was "willing to consider amending the terms if [it would be] able to recoup the costs incurred by [ACTONet] and [its] potential lost profits." Trial Exhibit 5. The letter stated that ACTONet incurred $22,093 in expenses to develop the website and that its lost profits over a sixty day promotion period were $7,200. The ACTONet letter further stated that lost profits were computed by estimating twelve per cent of sixty day's revenue if the site were promoted. Allou Health's Shamilzadeh subsequently sent ACTONet a termination letter dated September 29, 1997, stating that Allou Health was giving the sixty day notice required by the parties' agreement. See Trial Exhibit 7.

In the written agreement between Allou Health and Organic, which agreement was not executed until December 5, 1997, Allou Health committed to paying Organic for production and planning, in addition to commission and $2,000,000 for advertising.[3] Organic implemented a website for The Fragrance Counter subsequent to ACTONet's voluntarily transferring the domain of the website on December 26, 1997. ACTONet asserts that, in September 1997, Organic began visiting its website for The Fragrance Counter and copied its "HTLM" computer code.[4] ACTONet further asserts that Organic visited ACTONet's website for The Fragrance Counter "hundreds of times, compiling forty-four pages of reports of their visits," and that it would have not been possible for Organic to design and implement a website as quickly as it did without using ACTONet's HTLM computer code. Brief for Appellee at 8-9.

ACTONet sought recovery in the District of Nebraska from Allou Health for an alleged breach of the agreement for development of a website for The Fragrance

---

[3]According to ACTONet, the agreement between Allou Health and Organic provided that Organic would develop a website for a flat fee of $25,000. See Brief for Appellee at 9. However, the written agreement between Allou Health and Organic states that Allou Health was obligated to pay Organic $7,500 for strategic planning, $25,000 for web site enhancements, $60,000 for public relations, $60,000 for offline production, and $60,000 for online production, for a total cost of $212,500. See Trial Exhibit 14 at 15. Additionally, this agreement provides that, for net sales from zero to three million dollars, Organic would receive five percent of net sales; for net sales from three million to four million dollars, Organic would receive three percent, and for net sales over four million dollars, Organic would receive two percent. See Trial Exhibit 14, Attachment (Media Buying Service Agreement at 1). While ACTONet contends that the percentage of net sales which Allou Health was to pay Organic was less than twelve percent, Allou Health suggests that the total amount it was obligated to pay pursuant to its contract with Organic was more than it was obligated to pay pursuant to its agreement with ACTONet. See Brief for Appellee at 9; Brief for Appellant at 10.

[4]See discussion below explaining the nature of an HTML code.

Counter.[5]  In its Answer, Allou Health affirmatively alleged that the written contract provided for termination by either party on sixty days notice and that it had effectively terminated the contract in accordance with the agreement's provisions.  Allou Health further affirmatively alleged that ACTONet failed to completely create the website within a satisfactory time frame and that ACTONet  failed to mitigate its damages. Allou Health's motion for summary judgment was denied.  Over the objections of Allou Health, the district court concluded that paragraph 19 of the contract was ambiguous, allowed testimony regarding the parties' intentions as to its meaning, and submitted the issue of contract interpretation to the jury.  See Appendix for Appellant at 32-42  (Jury Instruction 6).

The district court's Instruction No. 6 stated to the jury  the meaning attributed by each party to paragraph 19 and further directed the jury as follows:

> I instruct you that the defendant had the right under the contract to cancel the contract without incurring any liability to the plaintiff unless paragraph 19 provides differently.  Therefore, it must be decided what paragraph 19 means. The parties dispute the meaning of paragraph 19 of the contract. ... In order to ascertain the meaning of paragraph 19 there are at least one and possibly three steps you must follow. I will list those steps for you now.

Instruction No. 6 further directed the jury that at the first step:

> You must decide whether the plaintiff and the defendant attached the same meaning to paragraph 19 when they entered into the contract.  If they did, then you are to apply that meaning to this dispute  and you need not go on to step two or three.  If they did not, then you must go on to the second, and possibly, the third steps.

---

[5]ACTONet also alleged in its complaint that it was entitled to recovery based on promissory estoppel and unjust enrichment.  The court dismissed these allegations at the conclusion of ACTONet's case in chief.

The second step of Instruction No. 6 stated that:

If you find that the plaintiff and the defendant attached different meanings to paragraph 19 when they entered into the contract, then you must make a second decision. Where the parties have attached different meanings to paragraph 19 when they entered into the contract, you must decide whether to apply paragraph 19 according to the meaning attached by one party. You make this decision by determining whether at the time the agreement was made: (a) a party intended one meaning and did not know of any different meaning attached by the other party, and (b) the other party knew, or had reason to know, the meaning attached by the first party.

If you find a party intended one meaning and did not know of any different meaning attached by the other party, and that the other party knew, or had reason to know, of the meaning attached by the first party, then you are to apply that meaning to this dispute and you should not go on to the third step. If that was not the case, you must go on to the third step.

The court further instructed the jury that at the third step, "[i]f the meaning of paragraph 19 was not established by application of the first two steps ...," then it was to apply the following meaning to paragraph 19:

Paragraph 19 means that if the defendant canceled the "planned Internet services" provided by the plaintiff, after the defendant approved and began to use that [i]nternet service, then the plaintiff is entitled to recover, upon cancellation of the contract, all of its costs, including development costs, that the plaintiff incurred in designing and operating the internet service. In addition, the plaintiff is entitled to recover the profits that the plaintiff would have earned on those costs from the date the defendant approved and began to use that internet service to a period not to exceed sixty (60) days following defendant's notice of termination.

-8-

The court did not submit a special verdict form to the jury. After a four day trial, the jury found Allou Health liable for breach of contract and awarded ACTONet $193,831.01. Consistent with the jury's verdict, judgment was entered on February 19, 1999. Allou Health's moved for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. The district court denied the motion. Allou Health now appeals from the final judgment.

## DISCUSSION

### A. Contract Ambiguity

Allou Health asserts that the district court erred in concluding that paragraph 19 of the agreement is ambiguous and by submitting to the jury the issue of its meaning. Allou Health claims that not only is its agreement with ACTONet unambiguous, but under Nebraska law, "when the contract is stated in unambiguous terms, 'the intentions of the parties must be determined from its contents alone.'" Brief for Appellant at 19, citing  T.V. Transmission, Inc. v. City of Lincoln, 374 N.W.2d 49, 52 (Neb. 1985). Allou Health further asserts that, "Nebraska law does not permit construction of an unambiguous written contract; the intent of the parties must be determined from the plain and ordinary meaning of the contract language." Brief for Appellant at 21. Allou Health maintains  that by its plain meaning its agreement with ACTONet was terminable at will with sixty days notice, that under no circumstances is it liable to ACTONet for any costs, and that it can be liable to ACTONet only for twelve percent of the web sales for the sixty days subsequent to its termination of the agreement.[6] It

_____

[6]Allou Health computes this amount to be $3,574.80, which represents twelve percent of its web sales for the sixty day period subsequent to its notice of termination in September 1997. Its sales for October 1997 were $11,191 and its sales for November were $29,790. See Brief for Appellant at 16 and Trial Exhibit 18 (document prepared by Allou Health pursuant to an order of the district court listing monthly gross sales for The Fragrance Counter).

further argues that the testimony of Brown concerning paragraph 19 effectively substituted the word "terminate" for cancel and changed the clear meaning expressed by the language of this paragraph. As it never "cancelled" a planned Internet service, but rather terminated the agreement pursuant to the provision for sixty days notice, Allou Health contends that it is not liable pursuant to paragraph 19 for development or other costs incurred by ACTONet.

ACTONet maintains that the agreement is ambiguous and that this ambiguity resulted from Allou Health's deletion of paragraph 16 and the application of the "description" to the ACTONet form sales agreement without paragraph 16. Because of the ambiguities in the agreement, ACTONet further contends that the intent of the parties and the meaning of the agreement must be determined by parol evidence. The intent of the parties, according to ACTONet, is that the agreement was binding for three years and that, if during that period Allou Health terminated the agreement or planned Internet services, ACTONet could recover all costs incurred and profits it would have earned on those costs over three years. ACTONet further claims that the language in the "description" is controlling as it reflects the parties' intentions that the contract was for three years.

We review the district court's determination of Nebraska law *de novo*. See LaSociete Generale Immobiliere v. Minneapolis Community Development Agency, 44 F.3d 629, 635 (8th Cir. 1994), cert. denied, 516 U.S. 810 (1995); International Union of Operating Engineers Local 571 v. Hawkins Construction Co., 929 F.2d 1346, 1348 (8th Cir.1991). The initial question of whether a contract is ambiguous is a question of law to be determined by the trial court. See Lamb Engineering & Construction Company v. Nebraska Public Power District, 103 F.3d 1422, 1431 (8th Cir. 1997), citing Smith v. Wrehe, 261 N.W.2d 620, 625 (Neb. 1978); McCormack v. CitiBank, N.A., 100 F.3d 532, 538 (8th Cir. 1996); Twin Towers Development, Inc., v. Butternut Apartments, L.P., 599 N.W.2d 839, 843 (Neb. 1999). Under Nebraska law, once the trial court determines that a contract is unambiguous, its construction is a

matter of law to be decided by the trial court. See LaSociete Generale, 44 F.3d at 635-636.

Here the district court found that the agreement was ambiguous and submitted the matter to the jury to determine the meaning of paragraph 19. Because it concluded that the agreement was ambiguous, the district court permitted the jury to consider parol evidence, including the testimony of ACTONet's Brown, to reach its determination regarding the meaning of the agreement between ACTONet and Allou Health. In our review of the district court's decision to submit the interpretation of the agreement to the jury, we must first determine whether the district court was correct in concluding that the agreement was ambiguous.

Under Nebraska law, the intent of the parties must be determined by the plain and ordinary meaning of the contract language as the ordinary or reasonable person would understand it. See Daehnke v. Nebraska Department of Social Services, 557 N.W.2d 17, 21 (Neb. 1996). "A contract is ambiguous when a word, phrase or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." Winfield v. CIGNA Companies, 532 N.W.2d 284, 286 (Neb. 1995); see also Union Insurance Co. v. Land and Sky, Inc., 529 N.W.2d 773, 776 (Neb. 1995). This determination is to be made on an objective basis, "not by the subjective contentions of the parties; thus, the fact that the parties have suggested opposing meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous." Twin Towers, 599 N.W.2d at 843; see also Estate of Stine v. Chambanco, Inc., 560 N.W.2d 424, 428 (Neb. 1997). In order to determine whether the agreement between ACTONet and Allou Health is ambiguous we must construe the agreement as a whole. See Daehnke, 557 N.W.2d at 21.

First, we will consider ACTONet's assertion that the agreement is for three years. Although the contract states in the "description" ACTONet's preference for a three year agreement, the language directly below the description plainly states that

-11-

"the following terms and conditions supercede and take precedence over the above description." ACTONet relies on the language of the "description" in support of its position that the parties intended that their agreement was for three years and maintains that it would not have agreed that Allou Health was not obligated to pay development costs if the agreement was not for three years.[7] Initially, we find that the plain meaning of the agreement clearly provides that the language of paragraphs 1 through 34 takes precedence and control over any language in the "description" if these paragraphs include language which contradicts the "description." Paragraph 25, which establishes the duration of the contract, states, "[t]he agreement may be terminated by either party on at least sixty (60) days prior written notice to the other party." Trial Exhibits 2A and 2B  Additionally, paragraph 26 includes an integration provision which provides that the "agreement contains the entire understanding between the parties ... ."  Trial Exhibits 2A and 2B  We further find that the "description," which is superseded by the language of paragraph 25, merely expresses the desire of ACTONet for a  three year term, but the agreement fails to incorporate this wishful thinking into a contractual provision.  Therefore, we conclude that the unequivocal language of paragraph 25 establishes that the agreement was open ended and could be terminated with sixty days notice.  Additionally, paragraph 26 provides  that the agreement stands on its own and does not incorporate terms not included within its express language.

The parties are in disagreement over the meaning of paragraph 19 as well as the effect, if any, of the elimination of paragraph 16 on Allou Health's liability for development costs and profits.  As stated above,  ACTONet asserts that paragraph 19 is ambiguous, while Allou Health maintains that it is not ambiguous.  ACTONet contends that ambiguities were created in paragraph 19 when the parties applied their

---

[7]ACTONet states that ninety percent of its costs were incurred during the  design and implementation phase of the agreement while ten per cent of costs and services would be provided during the remaining term of the agreement during the servicing and hosting phase. See Brief for Appellee at 7.

agreement to ACTONet's preprinted form. ACTONet maintains that paragraph 16 of its form agreement contemplates that ACTONet would be paid costs and profits as the work is performed. See Brief for Appellee at 16. While ACTONet suggests that the elimination of paragraph 16, without altering paragraph 19, created ambiguity, Allou Health maintains that the intent of the parties was reinforced by the deletion of paragraph 16. This intent, according to Allou Health was that it would have no initial site development costs. See Brief of Appellant at 25. As ACTONet signed the agreement after Allou Health distinctly drew a line through paragraph 16, we find that ambiguity does not exist regarding the deletion of this provision. We can only assume that, when Allou Health drew a line through paragraph 16, it meant to eliminate it, and that ACTONet accepted Allou Health's alteration of the form contract by signing the agreement with this deletion. Additionally, the interliniation of the words "gross sales less returns" fails to create ambiguity in reference to the removal of paragraph 16, as these words explicitly refer to the definition of gross sales rather than to production costs.

Paragraph 19 refers exclusively to costs incurred as a result of the cancellation of planned Internet services and makes no reference to development costs nor to termination of the entire agreement. However, Allou Health urges that the court distinguish between the words "cancellation" and "termination" and suggests that cancellation as used in paragraph 19 refers only to a partial termination, and that as it terminated the entire agreement, paragraph 19 is not applicable to any computation of ACTONet's damages. See Brief of Appellant at 29. In defining "cancellation," Black's Law Dictionary states that it is "[a]n annulment or termination of a promise or obligation." See BLACK'S LAW DICTIONARY 197 (7th ed. 1999). We hold that it is not necessary to consider the distinction urged by Allou Health because its termination of the entire agreement necessarily includes the cancellation of any "planned Internet services." We further hold that the plain meaning of paragraph 19 entitles ACTONet to recover any costs it incurred as a result of the cancellation of planned Internet services and profits on those costs, if Allou Health agreed to any such

services prior to the date of cancellation. Paragraph 19 explicitly imposes on ACTONet an obligation to mitigate its costs but permits its recovery of unavoidable costs incurred after the date that Allou Health informs it no longer desires Internet services. Although paragraph 19 does not define what is meant by planned Internet service, we conclude, considering the "description's" reference to Compuserve and Prodigy, that the plain meaning of the agreement's language establishes that the planned Internet services to which paragraph 19 refers include Internet services provided by ACTONet as well as by third parties. We further hold that, as paragraph 19, by its plain meaning, makes no reference to costs incurred for the development of the website, Allou Health's liability pursuant to this paragraph is limited to costs incurred due to cancellation of planned Internet services, which cancellations were necessitated by its termination of the agreement.[8]

ACTONet's letter of September 19, 1997, documented its costs incurred prior to that date, which costs did not include any planned Internet service. The costs listed covered of the hours spent by four employees and $100 for a digital I.D. Because ACTONet does not claim that it incurred costs for planned Internet service prior to September 19, 1997, the only costs which ACTONet can recover pursuant to paragraph 19 are those incurred as a result of Internet services, if any, to which Allou Health agreed after September 19, 1997, and prior to September 29, 1997, as well as unavoidable costs after this latter date.

Upon examination and consideration of the contract as a whole and giving its terms their plain and ordinary meaning, we conclude that it is not capable of being understood in more senses that one, and we are compelled to conclude that, as a matter of law, the agreement is terminable upon sixty days notice and that it is not ambiguous.

---

[8]The "description" states that where sales are generated through Compuserve and Prodigy, Allou Health is liable to ACTONet for four percent of gross sales, rather than the twelve percent for which it is otherwise liable.

-14-

Pursuant to the precise wording of the agreement, Allou Health is only liable to ACTONet for twelve per cent of gross sales less returns and allowances, as well as costs incurred by the cancellation of any planned Internet services and lost profits on such costs, through the end of November 1997.[9]

ACTONet asserts that to accept Allou Health's interpretation of the agreement "would be to work a great injustice and allow Allou to receive the benefit of the design and implementation of the website without requiring it to compensate ACTONet." Brief for Appellee at 16-17. ACTONet further contends that Allou Health would be unjustly enriched and that manifest injustice would result if this court were to find in favor of Allou Health, as this would permit Allou Health to take advantage of ACTONet's design and implementation of the website without being required to pay for it. See Brief for Appellee at 17. We disagree. ACTONet can not use judicial interpretation to seek relief from what in hindsight may have been poor business judgment. Where "two sophisticated parties [negotiate] a commercial contract which was executed in the absence of fraud, duress, or any other form of unconscionability, we will not rewrite the contract in order to save a contracting party from its own poor decisions." LaSociete Generale, 44 F.3d at 637.

B.  Evidentiary Matters

Allou Health contends that the trial court abused its discretion by admitting both the website review from Web Magazine and the HTML codes from the ACTONet and the Organic websites. See Trial Exhibits 15, 10 and 11, respectively. Allou Health further maintains that these exhibits should have been excluded as hearsay.

_____

[9]As the parties agree that the date of written termination was September 29, 1997, Allou Health is liable for lost profit on gross sales through November 1997.

-15-

"The hearsay rule excludes out-of-court assertions used to prove the truth of the facts asserted in them." Mueller v. Abdnor, 972 F.2d. 931, 937 (8th Cir. 1992). Fed. R. Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, "evidence not admissible as substantive evidence may come in for purposes of impeachment." Brown v. LaCreek Electric Association, Inc., 939 F.2d 623, 625 (8th Cir. 1991). A trial judge has broad discretion in the matter of admitting or excluding evidence and will not be overturned absent a clear abuse of discretion. Id. at 625.

The Web Magazine review critiqued the website which ACTONet developed for The Fragrance Counter. See Trial Exhibit 15. Allou Health asserts that this review does not fall within one of the specific exceptions to the hearsay rule and that, because it is prejudicial, it should have been excluded. ACTONet argues that the article is not hearsay because it not was introduced to prove the truth of the statements contained therein, but rather to impeach the claims of Allou Health's witnesses that the website was unsatisfactory. In support of its position regarding the Web Magazine review, ACTONet suggests that the review's admission was proper because over its objection the district court permitted Allou Health to read to the jury the deposition testimony of Eli Katz, David Shamilzedeh, and Michael Golden of Organic regarding the quality of ACTONet's website for The Fragrance Counter. ACTONet asserts that it did not expect these depositions to be used at trial and that it was precluded from issuing subpoenas to these individuals for testimony at trial because they live in New York State. In particular, ACTONet directs the court's attention to the deposition testimony of Golden regarding alleged deficiencies in the ACTONet website and describing Organic's research of its clients' existing websites. ACTONet asserts that admission of the website review was proper because Golden testified as an expert, and the website review was introduced as direct impeachment and rebuttal to his testimony. ACTONet also asserts that the website review was information in the public domain. In response to ACTONet's position regarding the review, Allou Health contends that

-16-

ACTONet did have the benefit of cross examining Golden and Katz, but that Allou Health was not afforded the opportunity to cross examine the author of the website review.

In support of its position that the website review was improperly admitted, Allou Health directs the court's attention to ADP-Financial Computer Services, Inc. v. First National Bank of Cobb County, 703 F.2d 1261, 1266 (11th Cir. 1983). In ADP the trial court did not allow the introduction of customer surveys to impeach testimony regarding the quality of the services provided by the appellee after the appellee was purchased by another company.[10] Id. In affirming the trial court's rejection of this evidence, however, the Eleventh Circuit found that the surveys did not compare the quality of services provided by the appellee to those provided since its purchase. We conclude that ADT is distinguishable from the matter under consideration because the website review directly addresses the quality of the ACTONet website, and because ACTONet offered the article for purposes of impeachment. Under such circumstances, we further hold that the district court did not abuse its discretion in admitting the review.

Over Allou Health's objection based on relevancy and hearsay, the district court permitted ACTONet to introduce the HTML code which it prepared for The Fragrance Counter website and HTML code which Organic subsequently provided for the website. See Trial Exhibits 10 and 11 (HTML codes for the ACTONet and for the Organic websites). Undisputed testimony establishes that an HTML code is a programing language which generates the visual appearance of a website. All websites use the

_____

[10]The court also rejected the admission of the customer surveys holding that they did not qualify as exceptions to the hearsay rule under the business record exception of Fed. R. Evid. 803(6) as records of regularly conducted activity or as an admission against interest by a party-opponent pursuant to Fed. R. Evid. 802(d)(2). ADP, 703 F.2d at 1266.

same language to produce their appearance, but it is the manner in which the code is used that produces the appearance of a website. Trial Transcript ("Tr.") at 183. This code, which is created by a designer, is unseen but is ultimately read by a word processor. See Tr. at 244. However, any person using a computer can view a website's HTML code because a function is built into a web browser which permits access by a choice on the menu bar, which choice is usually titled "view source" or "page source." Tr. at 213, 253.[11]

ACTONet introduced the HTML codes to support its assertion that Organic copied the code which it designed for The Fragrance Counter when visiting the ACTONet website. To the contrary, Allou Health contends that there are certain HTML tags which by their nature are necessarily included on both websites. Because it was not afforded the opportunity to cross examine the author of the Organic HTML code "as to the assertion that the [Organic] code was in fact what it was presented to be" and because "the similarity between the ACTONet HTML Code and the [Organic] Code was a linchpin to [ACTONet's] case," Allou Health contends that the admission of the HTML codes was hearsay and prejudicial. Reply Brief for Appellant at 20. ACTONet maintains that it was not seeking to admit the codes for the truth of the matter but rather to show what Organic displayed on the Internet. See Brief of Appellee at 27-28. ACTONet further maintains that an HTML code is similar to a photograph or a tape recording, and, therefore, is admissible.

An employee of ACTONet, who was instrumental in designing the HTML code for The Fragrance Counter website, testified as to how he developed the code with input from Allou Health.[12] He described how Allou Health supplied the database as the

---

[11]ACTONet does not claim that its HTML code is proprietary, nor does it claim that Organic obtained access to any of its proprietary information. See Tr. at 214.

[12]This designer, Bernie McGinn, testified that he began working on The Fragrance Counter website in the spring of 1997, when an employee who had already

-18-

source to display the products for The Fragrance Counter, and how he developed the HTML code to comply with the page layout desired by the client. The designer testified that he spoke directly to Allou Health's president Katz during the process of developing the HTML code and that during this process Katz made suggestions regarding the layout and content of the site and expressed a desire that the user be able to navigate through the site. The designer further testified how the ACTONet and the Organic codes were similar and how he prepared printed copies of the both the ACTONet and the Organic HTML codes for The Fragrance Counter. See Tr. at 255-256. Although the ACTONet and the Organic websites may or may not have had similar appearances, the evidence presented to the jury did not dispute that their ultimate functionality was the same.

Because web servers keep a log of all requests for a web page, ACTONet, with the use of a log file analyzation program called "Web Trends," determined that from September 15, 1997, through October 9, 1997, Organic accessed the ACTONet website for The Fragrance Counter approximately one hundred times. It was during this period that ACTONet alleges Organic was developing the website for The Fragrance Counter. Likewise, ACTONet admitted that it visited other websites when it was developing The Fragrance Counter website. See Tr. at 215.

The parties do not dispute that HTML codes are a programming language which give websites their appearance. Moreover, HTML codes may present visual depictions of evidence. We conclude, therefore, that HTML codes are similar enough to photographs to apply the criteria for admission of photographs to the admission of HTML codes. "The admission of photographs is a matter within the sound discretion of the trial court and its decision will not be overturned absent a clear showing of abuse of discretion." McCrary-El v. Shaw, 992 F.2d 809, 811 (8th Cir. 1993). "The test to

developed the general look of the website, including the color and the buttons that appear on the page, left ACTONet.

be applied is whether the prejudicial effect outweighs the probative value of the evidence." Hale v. Firestone Tire & Rubber Company, 756 F.2d 1322, 1333 (8th Cir. 1985). We conclude that the probative value of the HTML codes of both the ACTONet and the Organic websites outweighs any possible prejudicial value the codes might have had. We, therefore, hold that the district court did not abuse its discretion by admitting these codes. Additionally, we hold that an adequate foundation for the admission of the HTML codes was laid by the extensive testimony of the ACTONet designer.

Even if error were committed by admitting the website review or the HTML codes, reversal is not necessarily mandated. "An error, in order to be reversible, must affect a substantial right of the objecting party, and the burden of showing prejudice rests on that party." Crane v. Crest Tankers, Inc., 47 F.3d. 292, 296 (8th Cir. 1995) (citations omitted). See Fed. R. Civ. P. 61.[13] We conclude that Allou Health failed to meet its burden of establishing that it was prejudiced by the admission of either the website review or the HTML codes and that, at the very most, admission of this disputed evidence was harmless error.

Allou Health also takes exception to the trial court's admission of the top or white copy of the agreement between the parties. As stated above, the words "see front," written by Allou Health next to the extricated paragraph 16, appeared only on the top or white copy of the agreement because the pages were pressure sensitive. In the pre-trial conference, ACTONet designated the yellow copy as its exhibit, and this document was included in the pre-trial order as Exhibit 2. However, during the course of the trial, after the jury was selected and after opening statements, ACTONet sought to introduce the white copy, representing to the district court that the white copy had been found that morning. Over the objection of Allou Health, the district court admitted the white copy

---

[13]Fed. R. Civ. P. 61 states that no error in the admission of evidence is grounds for disturbing a judgment or granting a new trial unless the error is "inconsistent with substantial justice" or affects " the substantial rights of the parties."

as Exhibit 2B and designated the yellow copy as Exhibit 2A. Allou Health maintains that it was prejudiced by the admission of the white copy as its opening statement was predicated on the yellow copy. ACTONet asserts that Allou Health cannot claim prejudice or surprise because it endorsed the white copy for use as an exhibit. In support of this position ACTONet states that, not only was this copy produced from Allou Health's files, but that it was used during the deposition of David Shamilzadeh and as an exhibit in Allou Health's motion for summary judgment.

Fed. R. Civ. P. 16(e) permits modification of a pre-trial order.[14] However, "[a] pre-trial order will be modified only if there is no substantial injury or prejudice to the opponent." Glismann v. AT & T Technologies, Inc., 827 F.2d 262, 267 (8th Cir. 1987). Because it was well aware of the existence of the white copy and because its own representative wrote the words "see front" on the white copy, we find that Allou Health cannot claim surprise nor was it prejudiced by the admission of the white copy. We hold that the district court did not abuse its discretion in admitting the white copy of the agreement between the parties.

CONCLUSION

We conclude that a new trial is required in this matter because the district court improperly allowed the jury to interpret an unambiguous contract. See Lamb Engineering, 103 F.3d at 1433. Additionally, a new trial on the issue of damages is warranted because the instructions submitted to the jury did not reflect the plain meaning of paragraph 19 as determined by this court. For these reasons we reverse the judgment and remand this matter to the district court for further proceedings consistent with this opinion.

---

[14]Fed. R. Civ. P. 16(e) states that, "[a]fter any conference held pursuant to [Rule 16], an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order."

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.