**ELAVON, INC., formerly known as Nova Information Systems, Inc., Plaintiff,**

v.

**WACHOVIA BANK, NATIONAL ASSOCIATION; Wells Fargo & Company; Wells Fargo Bank, National Association; and First Data Merchant Services Corporation, Defendants.**

**Civil Action No. 1:09–CV–139–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

May 23, 2011.

---

Bruce R. Genderson, Catherine S. Duval, Dane H. Butswinkas, Daniel P. Pierce, Edward C. Barnidge, Embry J. Kidd, Scott K. Dasovich, Williams & Connolly, LLP, Washington, DC, Henry D. Fellows, Jr., Kevin P. Weimer, Fellows La Briola, LLP, Atlanta, GA, for Plaintiff.

Antonio E. Lewis, Pro Hac Vice, Cory Hohnbaum, Pro Hac Vice, King & Spalding, LLP, Charlotte, NC, Jennifer DeRelle Fease, L. Joseph Loveland, Jr., Tracy Cobb Braintwain, King & Spalding, LLP,

John Howard Fleming, Joshua A. Mayes, Rocco E. Testani, Valerie Strong Sanders, Sutherland Asbill & Brennan, LLP, Atlanta, GA, for Defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This case is before the Court on cross-motions for summary judgment. Plaintiff Elavon, Inc. ("Plaintiff" or "Elavon") has filed a Motion for Partial Summary Judgment [Doc. 167], to which Defendants Wachovia Bank, N.A. ("Wachovia Bank"), Wells Fargo Bank, N.A. ("Wells Fargo Bank"), and Wells Fargo & Co. (collectively "Defendants") have responded in opposition [Doc. 222] and Plaintiff has replied [Doc. 251]. Defendants have filed a Motion for Summary Judgment [Doc. 173], to which Plaintiff has responded in opposition [Doc. 219] and Defendants have replied [Doc. 249]. For the following reasons, Plaintiff's Motion for Partial Summary Judgment [Doc. 167] is GRANTED and Defendants' Motion for Summary Judgment [Doc. 173] is DENIED.

## I. *Plaintiff and Defendants*

Plaintiff Elavon, Inc. (formerly known as Nova Information Systems, Inc.) is a Georgia corporation with its principal place of business in Atlanta, Georgia [Plaintiff's Statement of Material Facts, Doc. 197 at 1]. Elavon is in the business of providing merchant processing services, specifically processing credit/debit card and certain other electronic transactions [*Id.* at 10].

At relevant times Defendant Wachovia Bank was a national banking association with its designated main office in North Carolina. [*Id.* at 2]. It was a wholly owned subsidiary of Wachovia Corporation. Wachovia Corporation is not named as a party in Plaintiff's Second Amended Complaint (the current operative complaint).

Defendant Wells Fargo & Co. is a Delaware corporation with its principal place of business in California [*Id.*]. Defendant Wells Fargo Bank, N.A. is a national banking association with its designated main office in South Dakota [*Id.*]. It is wholly owned by Wells Fargo & Co.

The parties agree that Georgia law applies. The agreement at issue states that Georgia law applies.

## II. *Issues Presented*

Plaintiff brought this suit against Defendants alleging breach of contract. Plaintiff claims that Defendants did not have a right to unilaterally cancel a written agreement between Plaintiff and the two Wachovia entities (Wachovia Corporation and Wachovia Bank) [Second Amended Complaint, Doc. 59 at 31–32]. Plaintiff seeks damages of approximately $1 billion or more [*Id.* at 32] and attorneys' fees and litigation expenses [*Id.* at 36].

Defendants respond that cancellation was allowable under the express terms of the agreement [Defendants' Answer to Plaintiff's Second Amended Complaint, Doc. 66 at 28–29, 35]. Defendants argue in the alternative that Wachovia Bank's performance under the agreement was excused on grounds of: (1) impossibility and/or impracticability in light of the economic conditions in 2008, (2) force majeure, and (3) unenforceability under the terms of § 126 of the Emergency Economic Stabilization Act of 2008, Pub.L. No. 110–343, 122 Stat. 3765, 3793 (2008) [*Id.* at 36–38]. Defendants have filed two counterclaims against Plaintiff–Count 1, Conditional Breach of Contract, and Count 2, Quantum Meruit or Breach of Quasi Contract [Doc. 66 at 42–43].

Plaintiff's breach of contract claim (Count I) and claim for attorneys' fees and litigation expenses (Count IV) and Defen-

dants' two counterclaims are the only remaining claims in this suit. On October 13, 2009 the Court granted Defendants Wells Fargo & Co. and Wells Fargo Bank, N.A.'s motion to dismiss Count II (tortious interference with contract claim) and Count V (claim for punitive damages) [Doc. 65]. On May 11, 2010, Plaintiff filed a notice of dismissal without prejudice of all claims against Defendant First Data Merchant Services Corporation ("First Data") including Count III [Doc. 127].

### III. *Undisputed Facts*

The following facts are undisputed unless indicated otherwise.

Between 2002 and December 31, 2008, Elavon and the two Wachovia entities had a written agreement through which Elavon provided credit/debit card charge processing services for merchants who banked with Wachovia Bank. The agreement called for Wachovia Bank to refer its merchant customers to Elavon for "merchant processing services." The precise mechanics of the referral process and the electronic credit/debit process are not explained by the current record. The written agreement was called an "Alliance Agreement"; between 2002 and December 31, 2008 the agreement was amended numerous times. The final amendment was captioned Fourth Amendment to the Amended and Restated Alliance Relationship Agreement and was executed between Elavon, Wachovia Corporation, and Wachovia Bank, N.A. on July 28, 2008. This amendment sets forth certain compensation and other terms which are relevant to issues raised by the motions for summary judgment. The 2008 amendment also extended the termination date of the Alliance Agreement to December 31, 2012.

The Alliance Agreement as amended by the Fourth Amendment called for Wachovia Bank and its "successors and assigns" to refer its merchant customers exclusively to Elavon for merchant processing services. In exchange, Elavon agreed to make a number of different types of payments [1] to Wachovia Bank. In the Alliance Agreement Elavon and Wachovia Bank also agreed to share the "merchant account royalties" generated by the merchant processing services, with Wachovia Bank to get 25% of the royalties (presumably 75% went to Elavon).

The record reflects that in 2008 the U.S. banking system experienced serious liquidity and solvency problems. During September and October, 2008, the United States was, according to Dr. Alan Greenspan, the former Chairman of the Federal Reserve, "in the midst of a once in a century credit tsunami." [Doc. 223 at 2]. Bank of America purchased Merrill Lynch; Lehman Brothers filed for bankruptcy; Goldman Sachs and Morgan Stanley were approved for conversion to bank holding companies; Fannie Mae and Freddie Mac were placed into receivership by the United States government; and Washington Mutual failed and was purchased by JP Morgan Chase [*Id.* at 2–3].

Wachovia Corporation reported a $664 million loss in net income in the first quarter of 2008 and an $8.9 billion quarterly loss in the second quarter of 2008. Wachovia Corporation's stock price fell and investors considered a Wachovia default increasingly likely [*Id.* at 3]. In September 2008, the Federal Deposit Insurance Cor-

---

1. These payments were: (1) Alliance Extension Payment ($47,500,000 over 5 years), (2) Program Support Payment ($7,500,000 over 5 years), (3) Referred Merchant Payment ($100 per referred merchant) and (4) Revenue Growth Incentive Payments (anywhere from nothing to $15,000,000 depending on growth of annual net revenue from the "Wachovia Portfolio").

poration ("FDIC") intervened to cause Wachovia to be taken over by another bank. On September 28, 2008 CitiGroup submitted a bid to acquire Wachovia Corporation with federal assistance [*Id.* at 8]. On September 29, 2008 the Federal Reserve announced that it was invoking the "systemic risk" exception under Section 13 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1811 *et seq.,* to allow open bank assistance[2] to Wachovia [*Id.* at 5]. On September 29, 2008 the Secretary of the Treasury authorized the FDIC to provide assistance to facilitate a sale of Wachovia Corporation to CitiGroup, Inc. [*Id.* at 9]. In the meantime Wells Fargo had undertaken its own investigation of Wachovia Corporation with a view toward a possible merger without federal assistance. On October 2, 2008, Wells Fargo & Co. made an offer to Wachovia Corporation to acquire it. No government financial assistance was involved. No government agency required Wells Fargo to make this offer. The Court does infer that federal officials encouraged Wells Fargo to promptly complete a merger once Wells Fargo's offer was accepted. On October 3, 2008 Wells Fargo announced that it had reached an agreement with Wachovia Corporation whereby it would be merged into Wells Fargo & Co.

Under the Agreement and Plan of Merger, Wells Fargo & Co. agreed to merge with Wachovia Corporation. Wells Fargo & Co. would be the surviving corporation. The Agreement and Plan of Merger stated, "[a]t and after the Effective Time, the Merger shall have the same effects set forth in the [Business Corporation Act of the State of North Carolina]" [Agreement and Plan of Merger by and between Wells Fargo & Co. and Wachovia Corporation, Doc. 197–20 at Sec. 1.3]. The Business Corporation Act of the State of North Carolina states, "[t]he surviving corporation has all liabilities of each merging corporation." N.C. GEN.STAT. ANN. § 55–11–06(a)(3).

Both sides agree that at the time the Wachovia–Wells Fargo Agreement and Plan of Merger was signed on October 3, 2008, Wells Fargo had no specific awareness of the Wachovia–Elavon Alliance Agreement that was to be in effect until December 31, 2012; Wells Fargo had not inquired about Wachovia's merchant processing business by that date [Doc. 197 at 19, 21]. It may be inferable that Wells Fargo knew of a likelihood that Wachovia had an outside contract for merchant processing services. Debra Rossi, the head of Wells Fargo's merchant services business and Wells Fargo's lead negotiator with First Data, became aware of the Wachovia–Elavon Alliance Agreement no later than October 21, 2008, but at that point the Agreement and Plan of Merger had already been executed; under its terms no further due diligence was allowable, i.e., changes in the merger agreement would not be allowed. Ms. Rossi reviewed the Alliance Agreement in November 2008 [Doc. 197 at 21–22]. The Court infers that particular scrutiny was caused by the fact that in November 2008 Wells Fargo Bank and Wachovia Corporation already had

---

**2.** The "Systemic Risk" section of the FDIA states that if a corporation's compliance with the FDIA would have serious adverse effects on economic conditions or financial stability, the corporation may take other actions than those defined in the FDIA in order to avoid or mitigate such effects. On September 29, 2008 the Federal Reserve encouraged coordinated actions between central banks in order to provide U.S. dollar liquidity and mitigate the pressures in the term funding markets in both the United States and abroad. In order to support this cooperation, the Federal Reserve provided a large quantity of term funding. Press Release, Board of Governors of the Federal Reserve System (Sept. 29, 2008), *available at* http://www.federalreserve.gov/newsevents/press/monetary/20080929a.htm.

their own contract for merchant processing services with a joint venture comprised of Wells Fargo Bank and First Data Merchant Process Services ("First Data contract"). The First Data contract which existed in October 2008 was set to last until December 31, 2009.[3]

There is substantial evidence in the record that Ms. Rossi and other Wells Fargo representatives were concerned about liability to Elavon under the Alliance Agreement.

On December 29, 2008 Wachovia Bank and Wachovia Corporation notified Elavon that they were cancelling the Alliance Agreement effective upon Wells Fargo & Co.'s merger with Wachovia Corporation. The letter stated:

Pursuant to § 17.2 of the Amended and Restated Alliance Relationship Agreement between and among Elavon, Inc. (f.k.a. NOVA Information Systems, Inc.)("Elavon"), Wachovia Corporation, and Wachovia Bank, National Association (collectively referred to as "Wachovia"), and § 2.10 of the *Fourth Amendment to the Amended and Restated Alliance Relationship Agreement between and among Elavon and Wachovia* (the "Alliance Agreement"), Wachovia hereby states its intent to cancel the contract and therefore terminate the Alliance Agreement effective December 31, 2008, subject to consummation on the date of Wachovia's anticipated merger with Wells Fargo & Company ("Wells Fargo").

[Pl.'s Ex. 58, Doc. 197–63]. On January 5, 2009 Elavon responded, "[n]either Wachovia Corporation nor Wachovia has the right to cancel or terminate the Alliance Agreement effective December 31, 2008" and "[n]otwithstanding the Wachovia Letter, the Alliance Agreement remains in full force and effect in accordance with its terms." [Defs.' Ex. 16, Doc. 173–19]. Elavon also wrote Wachovia on January 28, 2009 informing Defendants that it was

. . . ready, willing, and able to make the Elavon Payments if Wachovia and Wells Fargo promptly rescind or revoke their repudiation of the Agreement and give Elavon reasonable assurances that they will honor their continuing obligations thereunder.

[Pl.'s Ex. 154, Doc. 219–65 at 2].

On December 31, 2008, Wachovia Corporation was merged into Wells Fargo & Co. Presumably Wells Fargo & Co. assumed all obligations of Wachovia Corporation. Apparently Wachovia Bank survived the merger and became a subsidiary of one of the Wells Fargo entities.[4] The record suggests that Wachovia Bank merged into Wells Fargo Bank in March 2010 [Doc. 220 at 18; Pl.'s Ex. 94 at 3].

Notwithstanding the merger, legacy Wachovia Bank branches continued doing business with Elavon until December 31, 2009. Beginning at least by January 5, 2010, Wells Fargo Bank began referring merchants from the legacy Wachovia Bank branches to the joint venture with First Data [Doc. 197 at 27]. Elavon made no payments to Wachovia Bank or Wells Fargo Bank for any of the referrals Elavon received in 2009 and did not make any of the annual payments associated with the Alliance Agreement for the year 2009 [Doc. 174 at 19]. The manner of distribu-

---

**3.** On December 31, 2008 Wells Fargo Bank increased its ownership in the joint venture to 60% and extended the length of the joint venture's merchant processing contract to December 31, 2014.

**4.** The documents executed at the December 31, 2008 closing are not in the record. The Court notes that the Agreement and Plan of Merger did allow for revisions of the form of reorganization set forth in that Agreement.

tion of the merchant account royalties for 2009 is unclear. Elavon brought suit seeking unspecified damages for Defendants' alleged failure to honor Wachovia's obligations under the Alliance Agreement as amended. The scope of Elavon's damages claim and the elements of damages claimed are unclear in the Second Amended Complaint.

## IV. *Motions for Summary Judgment*

The Court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks and citation omitted). To be material, a fact must be identified by the controlling substantive law as an essential element of the non-moving party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, the issue must be genuine; there is no genuine issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. In reviewing the record, the district court must construe the facts and make all reasonable inferences in favor of the non-moving party. *Id.* at 255, 106 S.Ct. 2505; *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008).

### A. *Plaintiff's Motion for Partial Summary Judgment*

In its Motion for Partial Summary Judgment, Elavon contends that under the undisputed evidence, no reasonable jury could find for Defendants on their affirmative defenses claiming that performance under the Alliance Agreement was legally excused because of (1) impossibility and/or impracticability (Defendants' eighth defense), (2) force majeure (Defendants' ninth defense), or (3) unenforceability under the terms of § 126(c) of the Emergency Economic Stabilization Act of 2008 ("EESA") (Defendants' eleventh defense). Elavon also argues that it should be granted summary judgment on Wachovia Bank's conditional breach of contract counterclaim [Docs. 61 and 66] because Wachovia Bank's anticipatory repudiation of the contract released Elavon from any future duty to perform under the contract. Summary judgment in Elavon's favor is warranted on these claims.

#### 1. *Defendants' Impossibility and/or Impracticability Defenses*

■ Elavon contends that Defendants' impossibility and/or impracticability defenses fail as a matter of law because (1) Defendants themselves created the "impossibility scenario," (2) Defendants cannot show that their breach was caused by "the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made," (3) the financial downturn cannot excuse Defendants' performance, and (4) performance of the contract was objectively possible. Defendants counter that in a period of one month, a series of unprecedented, unpredictable, and unthinkable events occurred which caused the banking landscape to deteriorate, and Defendants could not have foreseen the market destruction that resulted. Defendants assert that the question of

whether the economic downturn was foreseeable is a question of fact that should be left to the jury, and such economic crisis made it impracticable and/or impossible for Defendants to honor the Alliance Agreement obligations.

■ Georgia law states: "If performance of the terms of a contract becomes impossible as a result of an act of God, such impossibility shall excuse nonperformance, except where, by proper prudence, such impossibility might have been avoided by the promisor." O.C.G.A. § 13–4–21. An act of God is defined as "[a]n overwhelming, unpreventable event caused exclusively by forces of nature, such as an earthquake, flood, or tornado." BLACK'S LAW DICTIONARY (9th ed.2009). The economic downturn of 2008 was not an "act of God." Further, financial inability does not excuse contract performance as impossible. *See Hampton Island, LLC v. HAOP, LLC,* 306 Ga.App. 542, 547–48, 702 S.E.2d 770 (Ga.Ct.App.2010) ("[T]he fact that one is unable to perform a contract because of his inability to obtain money, whether due to his poverty, a financial panic, or failure of a third party ... will not ordinarily excuse nonperformance ...").

Defendants' impossibility defense fails as a matter of law. The fundamental question is whether it was impossible for Wachovia Bank/Wells Fargo to continue to honor the merchant referral requirements of the Alliance Agreement after December 31, 2008. Obviously, this was not impossible. Assuming that Wachovia Bank was a subsidiary of one of the Wells Fargo entities after December 31, 2008, it is unclear why Wachovia Bank could not continue the referrals. In fact Wachovia did continue the referrals for a year. Also, Wells Fargo Bank had its own merchant processing agreement with a joint venture which, as of December 31, 2008, Wells Fargo controlled. Wells Fargo could have modified that agreement if it wished to do so. It also could have made a cash payment in satisfaction of its obligation to Elavon. (It is unclear whether it attempted to do so.) Whether the parties could have foreseen the financial debacle of 2008 is irrelevant; Wells Fargo & Co. decided to acquire Wachovia Corporation with full knowledge of the crisis in the banking industry. No one forced Wells Fargo to merge with Wachovia Corporation. The possibility of Wachovia Bank being acquired by another company was foreseen in the Alliance Agreement (which gave Elavon but not Wachovia the right to cancel the Agreement in the event Wachovia was acquired by another company). Wells Fargo knew about the Alliance Agreement before the merger was concluded and had actual notice of its provisions.

An impossibility defense is difficult to establish.[5] Defendants have failed to identify evidence which shows that performance of their obligations under the Alliance Agreement was "impossible" as defined by the doctrine of impossibility.

■ As to Defendants' impracticability defense, Georgia law states that a party has not breached a contract by non-per-

---

**5.** In *Felder v. Oldham,* the Georgia Supreme Court determined that even World War II was not an unforeseen event that would support an impossibility defense to contract termination. *Felder v. Oldham,* 199 Ga. 820, 824–25, 35 S.E.2d 497 (Ga.1945). The Georgia Supreme Court reasoned that the war could "in no sense be said to be an act of God" and instead may be anticipated. *Id.* If the Georgia Supreme Court determined that World War II was a foreseeable event that could be anticipated and protected against in a contract, certainly a financial downturn—such as that upon which Defendants rely in their impossibility and/or impracticability defense—can be anticipated and protected against when formulating a contract.

formance "if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." O.C.G.A. § 11-2-615. The Georgia Court of Appeals has determined that the defense of impracticability contemplates the impracticability of performance by a seller of commercial goods. *Calabro v. State Med. Educ. Bd.,* 283 Ga.App. 113, 115, 640 S.E.2d 581 (Ga. Ct.App.2006). Thus, the impracticability defense is inapplicable here because Defendants were not in the business of selling commercial goods to Elavon. Even if the impracticability defense were applicable here, it would fail because the economic downfall of 2008 was not a contingency "the non-occurrence of which was a basic assumption on which the contract was made." As discussed above, changes in the economic banking environment and the potential acquisition of Wachovia by another entity were foreseen and accounted for in the Alliance Agreement. Defendants' impracticability defense fails.

The Court GRANTS summary judgment in favor of Plaintiff on Defendants' impossibility and/or impracticability defense.

### 2. *Defendants' Force Majeure Defense*

■ Elavon argues that summary judgment as to Defendants' force majeure defense is proper because Defendants themselves, not any force majeure or third party, created the conflict with the Alliance Agreement because Wells Fargo Bank chose to sign a six-year contract with First Data when Wells Fargo knew that a merger with Wachovia was pending and knew of Wachovia Bank's contract with Elavon. Plaintiff also contends that even if the drastic changes in the financial market were considered a force majeure, the Alliance Agreement's force majeure clause did not include financial crises in the list of what force majeure instances

would constitute a reason to terminate the contract. Defendants counter that the enumerated list of events that constituted force majeure under the Alliance Agreement contract is not exhaustive but instead "without limitation as to other events beyond the control of the part[ies]." Defendants argue that the unprecedented economic crisis in 2008 was an event "reasonably beyond the control" of Wachovia and because the Alliance Agreement defines force majeure as "factors attributable to events reasonably beyond the control of the party obligated to perform," the force majeure provision of the contract applies in this case. Defendants also assert that the question of whether an event qualifies as force majeure is a question reserved for the jury.

The Alliance Agreement defines force majeure as follows:

> **"Force Majeure"** means factors attributable to events reasonably beyond the control of the party obligated to perform, including, without limitation, war, armed conflict, acts of terrorism or other similar events, conditions or events of nature, civil disturbances, failures of telephone lines and equipment, computer hardware or software failures or fires.

[Amended and Restated Alliance Relationship Agreement, Doc. 59–1 at 5–6]. The Alliance Agreement also contains a force majeure clause:

> **Article XVII—Miscellaneous**
>
> **17.13 Force Majeure.** Notwithstanding any provision to the contrary contained herein, no party hereto shall have any liability to any other party hereto for any failure or deficiency in performance of obligations hereunder occurring by reason of *Force Majeure.*

[*Id.* at 55].

The economic downturn in 2008 and the subsequent events that followed do not

constitute a force majeure which excused Defendants' performance of their obligations under the Alliance Agreement. While the economic perils that faced the banking industry during 2008 may have been "reasonably beyond the control" of Wachovia, the decision to extend the Wells Fargo–First Data contract was well within Defendants' control. Thus, there was no external force majeure that prevented Wachovia from continuing to perform under the Alliance Agreement. The financial crises in 2008 did not objectively prevent Wachovia from continuing to refer customers for merchant processing services to Elavon; Defendants themselves decided to stop making the referrals. Additionally, as discussed above, the possibility of the acquisition of Wachovia was contemplated in the Alliance Agreement. More fundamentally, the issue here is whether Wells Fargo's/Wachovia's performance of their obligation under the Alliance Agreement was excused. This is different from the question whether the banking crisis constitutes a force majeure. There remains no question of fact as to whether a force majeure excused Defendants' performance under the Alliance Agreement as amended. The Court GRANTS summary judgment in favor of Plaintiff on Defendants' force majeure defense.

3. *Defendants' Affirmative Defense Under the Emergency Economic Stabilization Act of 2008 ("EESA")*

 Defendants' eleventh defense claims that if, as Elavon contends, the Alliance Agreement grants Elavon exclusive rights to all of Wells Fargo's merchant services business as a result of the merger, the Alliance Agreement, in whole or in part, would be unenforceable under the terms of § 126(c) of the EESA because it would have added a significant cost to the merger and limited Wells Fargo's ability to acquire Wachovia [Doc. 66 at 37].

Elavon argues that summary judgment should be granted in its favor on this defense because vendor contracts such as the Alliance Agreement are not "other agreements" within the meaning of the EESA and because the Alliance Agreement did not directly or indirectly affect Wells Fargo's ability to acquire Wachovia. Defendants counter that summary judgment should not be granted because there remain questions of fact as to whether the Alliance Agreement falls within the meaning of the EESA and whether it affected the Wachovia–Wells Fargo merger.

Section 126(c)(11) of the EESA states:

UNENFORCEABILITY OF CERTAIN AGREEMENTS—No provision contained in any existing or future standstill, confidentiality, or other agreement that, directly or indirectly—

(A) affects, restricts, or limits the ability of any person to offer to acquire or acquire,

(B) prohibits any person from offering to acquire or acquiring, or

(C) prohibits any person from using any previously disclosed information in connection with any such offer to acquire or acquisition of, all or part of any insured depository institution, including any liabilities, assets, or interest therein, in connection with any transaction in which the Corporation exercises its authority under section 11 or 13, shall be enforceable against or impose any liability on such person, as such enforcement or liability shall be contrary to public policy.

Emergency Economic stabilization Act of 2008, Pub.L. No. 110–343, 122 Stat. 3765, 3795–96 (2008).

The facts in the record show that the Alliance Agreement did not affect, restrict, or limit the ability of Wells Fargo to offer to acquire or acquire Wachovia; that the Alliance Agreement did not prohibit Wells

Fargo from offering to acquire or acquiring Wachovia; and that the Alliance Agreement did not prohibit Wells Fargo from using any previously disclosed information in connection with any such offer to acquire. Ultimately, Wells Fargo acquired Wachovia without hindrance. Defendants' assertion that, had Wells Fargo known about the Alliance Agreement before it agreed to acquire Wachovia, the Alliance Agreement may have affected Wells Fargo's decision to acquire Wachovia is only speculation and not a factual allegation supported by facts in the record. "[U]nsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir.2005).

Furthermore, even if Defendants' assertion were supported by facts in the record (and therefore potentially meritorious), the Alliance Agreement is not among the "other agreements" the EESA was enacted to protect against. While there is little relevant case law regarding what "other agreements" fall under Section 126(c) of the EESA,[6] the controlling cannon of statutory construction suggests that "other agreements" does not include the Alliance Agreement. The Supreme Court of the United States has held, "when a general phrase follows a list of specifics, it should be read to include only things of the same type as those specifically enumerated" so long as the items that are specifically enumerated have "common attributes." *James v. United States,* 550 U.S. 192, 199, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007). Here, both a "standstill agreement" and a "confidentiality agreement" are agreements signed during negotiations for a particular business transaction. The Wachovia–Elavon Alliance Agreement was not executed in such a manner; it is an ordinary commercial agreement executed in the ordinary course of business. The "other agreements" in § 126(c) of the EESA do not include ordinary commercial commitments such as the Alliance Agreement and thus the EESA is inapplicable here. The Court GRANTS summary judgment in favor of Plaintiff as to Defendants' eleventh defense.

### 4. Defendant Wachovia Bank's Conditional Breach of Contract Counterclaim

■ Elavon asserts that summary judgment should be granted in favor of Elavon as to Wachovia Bank's conditional breach of contract counterclaim because Wachovia Bank's December 29, 2008 termination letter and subsequent actions constituted anticipatory repudiation, releasing Elavon from any future duty to perform under the Alliance Agreement contract. The Court agrees.

■ Anticipatory repudiation occurs "when one party thereto repudiates his contractual obligation to perform prior to the time such performance is required under the terms of the contract." *Textile Rubber & Chem. Co. v. Thermo–Flex Techs., Inc.,* 301 Ga.App. 491, 494, 687 S.E.2d 919 (Ga.Ct.App.2009). Here, Defendants repudiated the contract when they sent a letter to Elavon on December 29, 2008 stating, "Wachovia hereby states

---

**6.** The only case the parties cite to in which the meaning of "other agreements" in § 126(c) of the EESA is contemplated is *Wachovia Corporation v. Citigroup, Inc.,* 634 F.Supp.2d 445 (S.D.N.Y.2009). In *Wachovia Corporation,* the United States District Court for the Southern District of New York determined that an agreement at issue which "prohibited Wachovia from soliciting any acquisition proposals from third parties or entering into negotiations with any third party for the purpose of securing an acquisition proposal" was the type of "other agreement" addressed by § 126(c) of the EESA. *Wachovia Corp. v. Citigroup, Inc.,* 634 F.Supp.2d 445, 448–49 (S.D.N.Y.2009).

its intent to cancel the contract and terminate the Alliance Agreement effective December 31, 2008 . . ." [Doc. 197–63]. On January 5, 2009, Elavon replied to Defendants' December 29, 2008 letter, insisting that the Alliance Agreement remained in full force and effect [Doc. 173–19 at 2]. In a January 28, 2009 follow up letter, Elavon wrote Defendants stating:

> Elavon stands ready, willing, and able to make the Elavon Payments if Wachovia and Wells Fargo promptly rescind or revoke their repudiation of the Agreement and give Elavon reasonable assurances that they will honor their continuing obligations thereunder.

[Doc. 219–65]. Defendants never rescinded their termination nor provided the requested assurances, effectively repudiating the Alliance Agreement contract. Defendants cannot now claim that Elavon breached the exact same contract that Defendants first repudiated. The Court GRANTS summary judgment in favor of Plaintiff as to Defendant Wachovia Bank's conditional breach of contract counterclaim [Doc. 66 at 42].

### B. *Defendants' Motion for Summary Judgment*

Defendants argue that summary judgment should be granted in their favor because as a matter of law, Wachovia and Wells Fargo properly terminated the Alliance Agreement when they invoked the Contract Cancellation Fee provision in ¶ 2.10 of the contract. Defendants alternatively argue that as a matter of law, Elavon cannot collect damages based on Wells Fargo's failure to refer merchant customers to Elavon and also because Elavon's claim for future lost profits is too speculative. The Court disagrees with these arguments.

### 1. *Whether Wachovia/Wells Fargo breached the Alliance Agreement*

 Defendants contend that they did not breach the Alliance Agreement by cancelling it because Wachovia properly invoked the Contract Cancellation Fee provision in Section 2.10 of the Alliance Agreement "providing that Wachovia could terminate the Agreement for any reason, as long as it paid the fee required under that provision" [Doc. 173–42 at 14]. Elavon counters that Article IV—Term and Termination—of the Alliance Agreement provides the grounds for termination, Article IV states that the contract is for a definite five-year term which is not terminable at will and further specifies events of default, none of which apply in this case.

Article II—Financial Terms—Section 2.10 of the Fourth Amendment of the Alliance Agreement states:

> **Contract Cancellation Fee.** In the event this Agreement is terminated for any reason and by any party prior to December 31, 2012 (except as limited by the following proviso), then NOVA shall be entitled to receive a "Contract Cancellation Fee," calculated as set forth below; *provided, however,* that in the event Wachovia terminates this Agreement pursuant to Section 4.3(a) 4.3(b), or 4.3(d) hereof, then NOVA shall not be entitled to any such Contract Cancellation Fee. The Contract Cancellation Fee payable to NOVA shall be calculated as follows, and based upon the Calendar Year during which the effective date of such termination may occur:
>
> (a) If the effective date of termination occurs in the Calendar Year ending December 31, 2008, the Contract Cancellation Fee shall be calculated by multiplying $11,000,000 (representing the advance amounts paid by NOVA to Wachovia toward the Alliance Extension

Payment and Program Support Payment, respectively, for the Agreement Year ending December 31, 2008) by a fraction, the numerator of which is the number of days from the effective date of termination until December 31, 2008, and the denominator of which is 365. [Doc. 59–5 at 27] (Paragraphs (b)-(e), pertaining to cancellation in each of years 2009–2012 are omitted here).

Article IV—Term and Termination—provides:

**Article IV—Term and Termination**

**4.3 Termination by Wachovia.** In the event that:

(a) NOVA materially defaults in the performance of any of its material obligations under this Agreement and fails to cure such default within 30 days after written notice (which notice indicates that Wachovia may terminate this Agreement pursuant to this Section 4.3(a) if such default is not cured as provided herein) and demand for cure by Wachovia . . . ;

(b) any material amount due and payable to Wachovia by NOVA under this Agreement is not paid within fifteen Business Days after NOVA receives written notice (which notice indicates that Wachovia may terminate this Agreement pursuant to this Section 4.3(b) if such non-payment is not cured as provided herein) of such non-payment, and demand for cure (provided that Wachovia has attempted to debit, or cause to be debited, the Settlement Account for such amount in accordance with Section 8.2(e) hereof) . . . ;

(c) USB or NOVA experiences a consummated Change in Control; or

(d) there occurs a Voluntary Bankruptcy Proceeding with respect to NOVA;

then, in any such case, Wachovia, at its option, may immediately terminate this Agreement upon written notice to NOVA. . . .

[Doc. 59–1 at 19–20].

Elavon is correct on this issue. The provisions of Article IV govern grounds for termination, not Article II which pertains to financial terms. There is no ambiguity in the Alliance Agreement, as amended on this point. Also, Defendants' argument that Section 2.10 is a liquidated damages clause is misguided. Section 2.10 is designed to rebate unearned portions of the Alliance Extension Payment and the Program Support Payment if the Alliance Agreement were to end before December 31, 2012. Section 2.10 does not purport to estimate Elavon's total damages for breach.

■ "Georgia law does not interpret contracts as providing for liquidated damages unless it is clear that the parties intended it." *ADP–Fin. Computer Servs., Inc. v. First Nat'l Bank of Cobb Cnty.*, 703 F.2d 1261, 1264 (11th Cir.1983). "While the words 'liquidated damages' are not specifically required, some manifestation of the parties intent to agree to liquidated damages is." *Id.* Nowhere in Section 2.10 of the Alliance Agreement do the parties indicate an intent to agree to liquidated damages nor does Section 2.10 specify that the designated "Contract Cancellation Fee" extinguishes, satisfies, or liquidates the damages in the event of a breach of the Alliance Agreement. Therefore, Wachovia cannot terminate the Agreement "for any reason" as long as it has paid the fee (which Defendants call a liquidated damages fee) required under Section 2.10.

The Court need not address the parol evidence presented by Elavon in its memorandum in opposition to Defendants' Motion for Summary Judgment because the

Alliance Agreement contract itself shows without ambiguity that Article IV controls. Under Article IV no event of default occurred which entitled Wachovia/Wells Fargo to cancel the Alliance Agreement.

### 2. Whether the Defendants are required to honor Wachovia Bank's referral obligations to Elavon

 Defendants argue that the referral obligations in the Alliance Agreement did not and could not bind a nonsignatory company (Wells Fargo). They also point out that the referral obligation of Section V of the Alliance Agreement is limited to "Wachovia", defined as "Wachovia Bank, National Association, together with any other banking subsidiary of Wachovia Corporation." They argue that the referral obligation of Section 5.2 does not apply to Wachovia Corporation. That being the case, Wells Fargo & Co. did not assume this obligation in the merger.

Elavon contends that the terms of the Alliance Agreement imposed affirmative referral obligations on all current and future banking subsidiaries of Wachovia Corporation and expressly provided for referral obligations to travel "upstream" to any successor of Wachovia Corporation or Wachovia Bank.

It is true that an agreement between Wachovia and Elavon could not (and did not) bind a third party nonsignatory (Wells Fargo). However, it is equally true (and more to the point) that Wells Fargo & Co. assumed Wachovia Corporation's obligations to Elavon when the merger took place. Therefore, the first question is whether Wachovia Corporation had a referral obligation under Section 5 of the Alliance Agreement. Defendants are correct that it did not. Because of the manner in which "Wachovia" was defined in the Alliance Agreement, the referral obligations bound Wachovia Bank, not Wachovia Corporation. Because Wells Fargo &

Co. did not assume the obligations of Wachovia Bank in the merger, Wells Fargo & Co. is not responsible to Elavon for failure to make referrals.

Having said that, it may be that Wells Fargo Bank, N.A. continues to be responsible for any breach of the referral obligations in the Alliance Agreement. The Alliance Agreement specifies Wachovia Bank's responsibility; the record suggests that Wachovia Bank has been merged into Wells Fargo Bank, N.A. which is a party defendant in this case.

There are too many unresolved fact issues for the Court to grant summary judgment for Defendants on the instant claim. It does appear likely that Wells Fargo & Co. will be entitled to judgment on the issue of liability for breach of the Alliance Agreement's referral obligations, but the Court cannot make that determination at this time based on the facts in the record. No showing has been made that the other Defendants are entitled to judgment on this claim.

### 3. Lost Profits from the Wells Fargo Business

 Defendants assert that Elavon cannot seek to recover lost future profits for nonreferral of merchants because such future profits would be speculative and therefore unenforceable under Georgia law. Elavon counters that the lost future profits can be shown by the evidence of past earnings, expenses, and profits with reasonable certainty and the collection of such profits as damages is therefore not precluded by Georgia law.

 In Georgia, lost profits of a commercial venture are not recoverable unless the profits are capable of "reasonably accurate computation" because they are based on "an established business with clearly defined business experience as to profit and loss." *Molly Pitcher Canning*

*Co. v. Cent. of Ga. Ry. Co.*, 149 Ga.App. 5, 10–12, 253 S.E.2d 392 (Ga.Ct.App.1979). "[L]ost profits can be shown by the evidence of past earnings, expenses, and profits with reasonable certainty to enable the jury to calculate the damages." *Witty v. McNeal Agency, Inc.*, 239 Ga.App. 554, 562, 521 S.E.2d 619 (Ga.Ct.App.1999).

The Court cannot say as a matter of law that Elavon's claim for lost profits is too speculative for the trier of fact to consider.

While it is true that Elavon did not provide services to Wells Fargo prior to the Wachovia–Wells Fargo merger, industry experts may be able to calculate what Elavon's profits would have been from Wells Fargo referrals because both Elavon and Wells Fargo have extensive track records with merchant referral contracts. There is a question as to whether the merchant processing services provided by Elavon are the same as, or similar to, the services provided by the Wells Fargo/First Data Joint Venture. The Court cannot resolve this issue because it lacks sufficient information on which to base this determination. At this time, the record does not permit a ruling as a matter of law. Accordingly, summary judgment is DENIED on this claim.

The Court DENIES Defendants' Motion for Summary Judgment [DOC. 173].

## V. *Conclusion*

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment [Doc. 167] is GRANTED and Defendants' Motion for Summary Judgment [Doc. 173] is DENIED. The parties are DIRECTED to file a proposed consolidated pretrial order no later than June 22, 2011. The trial is set for August 1, 2011 at 10:00 a.m.